# EXHIBIT A

**1**

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT

VITA 4 LIFE, INC., an Illinois corporation, *on behalf of itself and all others similarly situated*,

                      Plaintiffs,

           v.

CYNOSURE, INC., a Delaware corporation,

                    Defendant.

Civil Action No. 17- 1869 F

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiff Vita 4 Life, Inc. brings this Class Action Complaint against Defendant,

Cynosure, Inc., for the false and misleading representations and omissions of material fact made

to Plaintiff and others similarly situated regarding the SculpSure Non-Invasive Body Contouring

Platform. Plaintiff alleges the following based upon personal knowledge and experience, and as

to all other matters upon information and belief, including investigation conducted by its

attorneys:

## I.    NATURE OF THE CASE

1.    In 2015, Cynosure, Inc. began selling the SculpSure Non-Invasive Body

Contouring Platform ("SculpSure") to physicians, aesthetic surgery practices, and medical spas

(or "med spas") in the United States. Cynosure marketed SculpSure as an effective way for the

medical practices to reduce fat in a patient's midsection through the use of laser technology.

2.    As part of an aggressive sales campaign to induce Plaintiff and the Class (defined

below) to purchase the $150,000+ machine, Cynosure made numerous uniform material

misrepresentations regarding certain attributes of the SculpSure device, including, *inter alia,*

that: (a) SculpSure could effectively reduce fat with just one 25-minute treatment; (b) the

treatment was virtually painless and easily tolerated; (c) the procedure did not require anesthesia;

(d) a physician and/or trained staff member did not need to be present during the entire procedure

to monitor the patient comfort level and adjust the treatment levels; and (e) no follow-up or

additional treatments were necessary.

3.    Cynosure's representations, however, are false. SculpSure rarely achieves results

in patients with just one 25-minute procedure. Furthermore, effective treatment with the device

can only be accomplished by turning the power level so high that it causes significant and

intolerable pain such that the procedure must be stopped.

4.     Accordingly, practices cannot in good faith recommend such an unpredictable and inconsistent treatment to their patients. To do otherwise would be encouraging these patients to undergo a procedure despite having little insight into whether they will see results, how many treatments they will need, or whether they can even tolerate the full 25 minutes. Practices naturally refuse to put their patients at risk or expend their time, money, and good will performing the procedure. In short, Cynosure has sold physicians, aesthetic surgery practices, and med spas a device costing over $150,000 that they cannot use.

5.     SculpSure is thus effectively useless for the purpose for which it was intended. The device cannot be used in the way that Cynosure marketed it. Plaintiff and the Class have been in fact deceived by Cynosure's representations, did not receive the benefit of the bargain, and suffered actual damages.

## II.     PARTIES

6.     Plaintiff Vita 4 Life, Inc. is an Illinois corporation located at 1300 Busch Pkwy, Buffalo Grove, Illinois. Vita 4 Life owns office space and medical equipment used by physicians. In turn, the doctors compensate Vita 4 Life for the use of the machines and treatment rooms. Vita 4 Life purchased SculpSure from Defendant on October 2, 2015 pursuant to a purchase agreement, which provides that "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. [Vita 4 Life] agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston, Massachusetts." Vita 4 Life was injured in its property and business by the actions of Defendant as described herein.

7.     Defendant Cynosure is a corporation incorporated and existing under the laws of Delaware with its principal place of business located at 5 W Carlisle Road, Westford,

- 3 -

Massachusetts, 01886.  Defendant Cynosure does significant business nationwide and

worldwide.

## III.    JURISDICTION AND VENUE

8.    This Court has jurisdiction and venue is proper because the action arises from acts

and occurrences within the Commonwealth of Massachusetts, the Defendant Cynosure is

headquartered in Westford, Massachusetts, and the parties agreed, via a choice-of-law provision

and forum selection clause in their purchase agreements, to submit all disputes to a court in

Boston, Massachusetts subject to Massachusetts law.

## IV.    FACTUAL BACKGROUND

### A.    The Noninvasive Body-Contouring Market

9.    Noninvasive body-contouring procedures constitute a large and rapidly growing

sector of the cosmetic surgery market in the United States, with the number of operations

performed having increased by approximately 6% in 2016 compared to the previous year.[1]

10.    These procedures aim to eliminate stubborn fat from certain areas of the body.

Body-contouring, however, differs from liposuction.  Liposuction uses suction techniques to

surgically extract fat deposits from specific areas of the body.  Because liposuction requires

anesthesia, it is typically an outpatient procedure at a surgery center, or if large amounts of fat

are being removed, the procedure will be done in a hospital and may require an overnight stay.

Patients typically return to work after several days and to normal activities within two weeks.[2]

---

[1] The American Society for Aesthetic Plastic Surgery, "2016 Cosmetic Surgery National Data Bank Statistics," at 12, *available at* http://www.surgery.org/sites/default/files/ASAPS-Stats2016.pdf.

[2] *Liposuction*, MAYO CLINIC (Nov. 29, 2016), http://www.mayoclinic.org/tests-procedures/liposuction/home/ove-20197272; *How to Choose Between Liposuction and Noninvasive Fat Reduction Procedures*, AM. BD. OF COSMETIC SURGERY BLOG (Aug. 19, 2015),
http://www.americanboardcosmeticsurgery.org/liposuction/how-to-choose-between-liposuction-and-noninvasive-fat-reduction-procedures/; *Liposuction*, MEDINCENET, http://www.medicinenet.com/liposuction/page3.htm (last visited May 22, 2017).

-4-

11.     Body-contouring, by contrast, uses noninvasive medical devices (*e.g.*, lasers) to eliminate or shrink fat cells without an incision or anesthesia. Practitioners most commonly (and most effectively) employ it to diminish small pockets of stubborn fat and reduce the circumference of a patient's midsection. These procedures are commonly performed in a physician's office or med spa without anesthesia and are appealing because they do not require any recovery time.[3]

12.     Body-contouring devices began appearing on the market approximately 10 years ago, and several companies have developed different technologies to achieve the desired results.[4]

13.     For example, Zerona uses a low-level laser to target superficial fat cells. The laser does not destroy or kill the fat cells, but disrupts their membranes causing them to release their contents. The end result is that the affected fat cells shrink, causing a reduction in the belly, waist, or body size of the patient. Patients feel no pain. However, because the treatment only targets superficial fat cells, it typically takes about six to twelve 40-minute treatments to achieve results.[5]

14.     Another technology, CoolSculpting, uses a process called cryolipolysis to kill fat cells. Because fat cells freeze at higher temperatures than the surrounding tissue, the CoolSculpting device can deliver cold temperatures through the skin to freeze fat cells without

---

[3] *How to Choose Between Liposuction and Noninvasive Fat Reduction Procedures*, AM. BD. OF COSMETIC SURGERY BLOG (Aug. 19, 2015), http://www.americanboardcosmeticsurgery.org/liposuction/how-to-choose-between-liposuction-and-noninvasive-fat-reduction-procedures/; Deborah Kotz, *CoolSculpting and Zerona: Body Sculpting Without Surgery*, US NEWS & WORLD REPORT (Sept. 17, 2010, 1:26 p.m), http://health.usnews.com/health-news/blogs/on-women/2010/09/17/coolsculpting-and-zerona-body-sculpting-without-surgery.

[4] AM. BD. OF COSMETIC SURGERY BLOG, *supra* note 3.

[5] *How Does the Zerona Laser Work?*, MYZERONA.COM, http://www.myzerona.com/what-is-zerona.html (last visited May 8, 2017); R. Stephen Mulholland, Malcolm D. Paul, & Charbel Chalfoun, *Noninvasive Body Contouring with Radiofrequency, Ultrasound, Cryoliolysis, and Low-Level Laser Therapy*, 38 CLINIC IN PLASTIC SURGERY 503, 514-17 (2011), *available at* http://www.invasix.com/upload/articles/peerrev_clinps_titefxmention.pdf; Kotz, *supra* note 3.

damaging the skin. Targeted fat cells eventually die before the body removes them through its natural processes, yielding a reduction in size in the treated area. However, because the machine works by pulling a patient's skin into the device to apply very cold temperatures, patients frequently experience discomfort for the first five to 10 minutes of the procedure. The entire procedure takes about an hour, but unlike the Zerona procedure, CoolSculpting can often take only one visit to achieve results.[6]

## B.   Cynosure Develops SculpSure to Compete Against Other Body-Contouring Machines

15.   Cynosure, located in Westford, Massachusetts, is a corporation that specializes in the marketing and sale of medical devices utilizing laser technology for cosmetic and aesthetic use. Specifically in the area of noninvasive body-contouring, Cynosure sells a device it calls "SculpSure."[7]

16.   Cynosure developed and manufactured SculpSure from its Westford offices to compete in the noninvasive body-contouring market against Zerona, CoolSculpting, and similar devices. The machine uses a laser to heat adipose tissue (loose connective tissue in which fat cells accumulate[8]) to a temperature between 42°C and 47°C. Cynosure claimed this would cause the targeted fat cells to eventually die before being removed by the body's lymphatic system.[9]

---

[6] *How It Works*, COOLSCULPTING, http://www.coolsculpting.com/what-is-coolsculpting/how-it-works/ (last visited May 9, 2017); *What To Expect*, COOLSCULPTING, http://www.coolsculpting.com/what-is-coolsculpting/what-to-expect/ (last visited May 9, 2017); *FAQs*, COOLSCULPTING, http://www.coolsculpting.com/what-is-coolsculpting/faqs/ (last visited May 9, 2017); Kotz, *supra* note 3;

[7] *About Cynosure*, CYNOSURE, http://www.cynosure.com/about-cynosure/ (last visited May 9, 2010); *SculpSure*, CYNOSURE, http://www.cynosure.com/product/sculpsure/ (last visited May 9, 2010).

[8] *Adipose Tissue*, DICTIONARY.COM, http://www.dictionary.com/browse/adipose-tissue.

[9] *SculpSure*, CYNOSURE, http://www.cynosure.com/product/sculpsure/ (last visited May 9, 2010).

17.    The machine has four long, flexible arms that are part of what Cynosure calls the "umbilical management system."  At the end of each arm is a rectangular applicator.[10]  Sample pictures follow:



18.    During the procedure, the operator arranges several plastic frames onto the patient's body in the treatment area, applies a lotion to certain areas of the patient's skin within those frames, and then attaches the rectangular applicators to the frames.[11]



19.    Each applicator used during the procedure consumes one "PAC."  PAC's are credits that Cynosure loads onto a PAC Key.  Without a sufficiently loaded PAC Key inserted into the USB port on the SculpSure, the machine will not function.  Med spas and physicians

---

[10] SculpSure Operator's Manual (Rev. 4, Apr. 2016), at 12.

[11] SculpSure Clinical Reference Guide (Rev. 2), at 24-28.

must therefore purchase PAC Keys from Cynosure in advance before treating patients. As of April 2016, a PAC Key came loaded with 100 PAC's and cost $5,000.[12]

20.    Once the applicators are in place, the operator initiates treatment. Treatment has two phases: "build mode" and "sustain mode." Build mode occurs for the first four minutes of the procedure, during which the machine attempts to "heat[] the fat to the target temperature." Sustain mode lasts the remaining 21 minutes and aims to "maintain[] the target temperature in the fat layer."[13]

21.    The machine can deliver energy in a range of 0.90 to 1.40 Watts per square centimeter ($W/cm^2$), in increments of 0.05 $W/cm^2$. The build mode power density setting defaults to 1.10 $W/cm^2$.



22.    Despite the default setting being set to 1.10 $W/cm^2$, SculpSure directs that the operator start at a low level and increase the power, adjusting the heat based on patient feedback. When the patient reports "moderate deep warmth and cooling" periods, the practitioner should

---

[12] SculpSure Operator's Manual (Rev. 4, Apr. 2016), at 36; CYNO - Q1 2016 Cynosure Inc Earnings Call, at 3 (Apr. 26, 2016).

[13] SculpSure Clinical Reference Guide (Rev. 2), at 29.

maintain that level.  Initially, Cynosure released the following Zone Adjustment Chart to guide

the treatment:[14]

| Zone Score | ZONE |
|---|---|
| 1 | **Pleasant cool/cold feeling.**<br>**Increase setting.** |
| 2 | **Gentle warming and cooling.**<br>**Increase setting.** |
| 3 | **Tingly, short intervals of warmth and cooling.**<br>**No change in setting.** |
| | **Longer peaks of moderate deep warmth and cooling.**<br>**No change in setting.** |
| | **Beyond Fat Destruction Zone.**<br>**Select Advance-to-Cool button.** |

23.     At no time during marketing of SculpSure did Cynosure report that patients would

feel pain, have to endure heat to the point of burning, or require anesthesia.

**C.     Cynosure Aggressively Markets SculpSure to Physicians and Practitioners as a Superior Device Requiring Only One 25-Minute, Pain-Free Treatment to Achieve Results**

24.     The FDA cleared Cynosure to market its SculpSure device in mid-2015.

Cynosure in turn planned to officially launch the product later that year.[15]

25.     By autumn 2015, Cynosure was engaged in a motivated campaign to sell

SculpSure to various cosmetic surgery providers, med spas, and practitioners across the country.

From its Massachusetts headquarters, the company developed promotional videos, brochures,

and sales pitches for its representatives.

---

[14] SculpSure Clinical Reference Guide (Rev. 2), at 32.

[15] *FDA Clears Expanded Use for Cynosure Lipolysis Device*, MEDICAL PRODUCT OUTSOURCING (Jul. 7, 2015), http://www.mpo-mag.com/contents/view_breaking-news/2015-07-07/fda-clears-expanded-use-for-cynosure-lipolysis-device/.

26.    Cynosure presented its new technology as state of the art, highlighting the age of its competitors (like Zerona and CoolSculpting), while emphasizing the supposed weaknesses of their older equipment. Cynosure specifically made it a point to distinguish SculpSure in two critical ways.

27.    First, Cynosure uniformly told potential buyers that patients would achieve results in a simple, one-time, 25-minute treatment that would not involve any downtime or follow up. By comparison, Zerona requires six to twelve 40-minute treatments and CoolSculpting takes upwards of an hour and could potentially require additional sessions to achieve results.

28.    This efficiency was particularly attractive to potential buyers. If the procedure truly only took 25 minutes, practitioners who owned a SculpSure could perform more treatments in a day without having to tax their staff, hire more employees, or perform follow-up with the patient. Furthermore, the minimal time commitment would likely convince more patients to opt for the procedure.

29.    Second, Cynosure stressed that the procedure would be a comfortable and pain-free experience for patients, despite the fact that SculpSure utilized very high temperatures to eliminate the fat cells.

30.    According to Cynosure, SculpSure's "Contact Cooling" system would "assist in maintaining safe and comfortable skin surface temperatures." At the proper setting, Cynosure claimed that SculpSure would cause no more than "long[] peaks of moderate deep warmth and cooling."[16] Cynosure's marketing brochures assured that "[m]ost patients feel a tingling sensation intermittently which is well tolerated."[17] And marketing videos provided by Cynosure

---

[16] SculpSure Clinical Reference Guide (Rev. 2), at 9, 32.

[17] SculpSure Marketing Brochure (2015), at 2.

to purchasers for use with their patients showed a woman casually using her cell phone during
her procedure, without any visible signs of discomfort.

31.     To contrast, CoolSculpting's suction mechanism and intense cold meant patients
would have to endure a few minutes of discomfort during the procedure. SculpSure thus offered
the promise of attracting those patients who may be more hesitant to body contouring.

32.     All told, Cynosure's efforts to sell the machine touting these supposed qualities
were successful.[18] Cynosure sold hundreds of SculpSure devices in late-2015 and 2016, with
approximately 350 in the vicinities of five cities (Boston, Los Angeles, Miami, Chicago, and
New York City) alone.[19]

33.     Hologic, Inc., who acquired Defendant for approximately $1.44 billion in early
2017, consistently singled out SculpSure when discussing reasons for the massive acquisition of
the company.[20]

## D.     SculpSure Does Not Work As Represented, Rendering the Product Useless for Practitioners and Physicians

34.     Cynosure's representations about SculpSure to its buyers, however, proved to be
false. In short, Cynosure misrepresented SculpSure's capability as a simple one-and-done
treatment without pain.

---

[18] *See* CYNO - Q1 2016 Cynosure Inc Earnings Call, at 3 (Apr. 26, 2016) ("By virtually every measure
SculpSure continues to exceed our expectation."); CYNO – Q2 2016 Cynosure Inc Earnings Call, at 3 (Jul. 26,
2016) ("Revenue for the quarter increased to a record $110.3 million, 32% higher than the year-over-year period.
The primary contributors to the top-line results were SculpSure, our exciting new hyperthermic laser treatment for
noninvasive fat reduction . . . ."); CYNO – Q3 2016 Cynosure Inc Earnings Call, at 3 (Oct. 25, 2016) ("I will now
update you on SculpSure, which has generated meaningful revenue for the past four full quarters and continues to
outperform our expectations."); CYNO – Q4 2016 Cynosure Inc Earnings Call, at 3 (Feb. 07, 2017) ("SculpSure,
one full year into its launch, remains ahead of our expectations. Q4 set the high watermark for SculpSure placements
in a single quarter.").

[19] *See Patients*, CYNOSURE, http://patients.cynosure.com/ (searching for SculpSure machines located within 100
miles of the following zip codes: 02201, 90001, 33018, 60611, and 10018).

[20] HOLX – Hologic Inc to Acquire Cynosure Inc Conference Call, at 4, 6-7, 9 (2017)

35.     From the onset, patients failed to achieve results from SculpSure despite being

treated as directed using Cynosure's Zone Adjustment Chart. Recognizing the problem,

Cynosure subsequently revised its treatment protocol for the SculpSure product. In April 2016,

Cynosure introduced a "Treat to Complete" treatment plan, advising doctors to manage a

patient's "expectations that multiple treatments may be part of the treatment plan."[21] The "Treat

to Complete" protocol, however, directly contradicted Cynosure's marketing of SculpSure as a

one-time, 25-minute treatment.

36.     Furthermore, Cynosure directed physicians and practitioners to raise the power

levels on the machine to compensate for the poor results. However, at these increased power

levels, many patients could not make it through the procedure without experiencing significant

pain. Practitioners reported that patients would jump off the treatment table or ask the doctor to

stop because they could not tolerate the procedure. Such circumstances are a far cry from the

"tingling sensation[s]" that Cynosure claims are "well-tolerated."[22]

37.     Nor could practices simply administer anesthesia to make the procedure more

tolerable. The procedure requires feedback from patients to determine the appropriate energy

level. If patients lack the ability to feel any pain or excessive heat in the treated area, then they

cannot provide the necessary response to the doctor to lower the power level on the machine.

Moreover, administering anesthesia would render the procedure inappropriate for med spas or

other medical offices—the very practices for whom SculpSure was designed and to which it was

marketed. Finally, any anesthesia, or even a strong oral analgesic, would require time before the

procedure to administer it, downtime after the treatment to allow the patient to recover, and a

---

[21] SculpSure Clinical Reference Guide (Rev. 4, Apr. 2016), at 15.

[22] SculpSure Marketing Brochure (2015), at 2.

doctor to monitor the patient to make sure he or she was fit to leave, rendering the promise of a 25-minute procedure untrue.

38.    Acknowledging patients' experiences, Cynosure updated its Zone Score Adjustment Chart on multiple occasions. Initially Cynosure claimed that a power level correlating with "[t]ingly, short intervals of warmth and cooling" in the patient would result in "fat destruction." By April 2016, however, Cynosure removed that claim. And by August 2016, Cynosure acknowledged that results would require "[p]rickling, pinching, pressure, [and] longer peaks of moderate deep heat and cooling." [23]



_____

[23] *Compare* SculpSure Clinical Reference Guide (Rev. 2), *with* SculpSure Clinical Reference Guide (Rev. 4, Apr. 2016), *and* SculpSure Clinical Reference Guide (Rev. 7, Nov. 2016).

39.    Ultimately, the situation has left practices in an impossible position. They have spent hundreds of thousands of dollars on a machine that does not work as Cynosure represented. At the same time, they lack the ability to recoup that cost; practices cannot in good faith recommend a cosmetic procedure to their patients knowing that it is likely to involve several painful treatments, but still unlikely to be effective.

E.    **Based on Cynosure's Misrepresentations, Plaintiff Vita 4 Life Purchases a SculpSure, Which Proves Unusable in Practice and Places Plaintiff under Considerable Financial Hardship**

40.    Vita 4 Life owns office space and medical equipment used by physicians. In turn, the doctors compensate Vita 4 Life for the use of the machines and treatment rooms.

41.    On or about September 30, 2015, Brad Hohenstein, a Cynosure sales representative, visited Vita 4 Life's office to solicit the company's owner, Victoria Plebanovich, to purchase a SculpSure machine.

42.    Plebanovich initially refused Hohenstein's solicitation. Vita 4 Life already owned a CoolSculpting device and had also just decided to purchase an additional competing device. Hohenstein persisted, urging Plebanovich to not go through with purchasing the other device because Sculpsure offered far superior technology.

43.    Plebanovich allowed Hohenstein to meet with her and the two doctors who rent and use Vita 4 Life's equipment and office space, Dr. Harry Keith Monroe and Dr. Thomas Heggen. During that meeting, Hohenstien assured Plebanovich and the physicians that: (a) SculpSure only required one 25-minute treatment simple enough to be performed on one's lunch break; (b) the treatment was virtually painless and easily tolerable by the patient; (c) the procedure did not require any anesthesia; (d) a physician and/or trained staff member did not need to be present during the entire procedure to monitor the patient comfort level and adjust the treatment levels; and (e) no follow-up or additional treatments were necessary.

44.     Hohenstein also assured Plebanovich and the physicians that peer reviewed studies demonstrated the safety and efficacy of SculpSure. Dr. Monroe asked Hohenstein to produce those studies, but Hohenstein never did.

45.     Based on Hohenstein's representations, Plebanovich decided to acquire a SculpSure for Vita 4 Life and, on October 2, 2015, entered into a Customer Purchase Agreement with Cynosure to buy the device for $165,000.00. Vita 4 Life would then finance the $165,000 purchase price over a period of 63 months, paying $99.00 per month for the initial three months, while paying the $3,840.67 per month for the remaining 60 months.

46.     In November 2015, Cynosure representatives provided training for Vita 4 Life and the physicians. At this time, Cynosure representatives reaffirmed to the physicians that the product was safe, effective, painless, and required only one 25-minute treatment. Once more, Cynosure representatives referenced the peer reviewed studies that allegedly confirmed the efficacy and safety of SculpSure.

47.     Dr. Harry Keith Monroe again requested Cynosure representatives produce the referenced studies, but at no time did Cynosure ever do so.

48.     Vita 4 Life took delivery of the SculpSure, and the doctors began treating patients as trained by Cynosure. As instructed, the machine operators utilized patient feedback to determine the appropriate power level for the machine, pressing the advance-to-cool button any time the patient noted the procedure was intolerable or too hot.

49.     Within approximately three months, all of the patients treated in the initial stages reported seeing no results, which the doctors confirmed during follow up. Vita 4 Life sought support from Cynosure, who offered little guidance, other than to suggest the doctors performed the procedure at too low of a power level.

- 15 -

50.     Increasing the power did not solve the problem and only ended up creating another one.  Many patients complained about the heat being too intense to continue with the procedure.  One patient reported pain that persisted beyond the treatment.  Multiple patients complained of nodule[24] formation in the treatment area.

51.     The physicians noted that a number of patients simply could not endure the treatment without some form of anesthetic.  But introducing this to the procedure would render SculpSure inappropriate for Vita 4 Life, a med spa.

52.     The situation forced the physicians at Vita 4 Life to lower the power level so that patients could endure the procedure for the full 25 minutes at the expense of results.  To compensate the patients for the trouble, the physicians offered repeat treatments at no cost.[25]  These follow up treatments were offered for free because the patients—like the physicians— were led by Cynosure to believe that no follow up appointments would be necessary.

53.     Several patients agreed to follow up procedures, with approximately 76 treatments administered by the physicians.  However, none of the patients showed measurable progress in fat reduction.

54.     Given the foregoing, Vita 4 Life and its staff raised concerns to Cynosure on numerous occasions over the telephone and via email.  Specifically, Vita 4 Life notified Cynosure that SculpSure did not perform as Cynosure represented it would and was effectively useless for the purposes for which it was purchased.

55.     In August 2016, Vita 4 Life first wrote asked to return the machine for a refund. Cynosure refused.

---

[24] A nodule is a small, palpable growth or collection of tissue on the body.

[25] The cost of a SculpSure treatment session may range from $2,500 to $3,500.

56.     By September 2016, doctors renting Vita 4 Life's equipment refused to use the

SculpSure on patients anymore. The doctors found the device did not perform as Cynosure

represented it would, and did not want to further risk the poor results and pain of the procedure

reflecting negatively on their practice.

57.     The machine went unused after that point, leaving Vita 4 Life with a $3,840.67

per month payment without any ability to recoup the cost. By December 2016, Vita 4 Life could

no longer afford to make payments on the machine and it was repossessed in Spring 2017.

58.     Had Cynosure truthfully represented the qualities of the device, Vita 4 Life would

not have purchased SculpSure.

## V.     CLASS ALLEGATIONS

59.     Massachusetts law applies nationwide to this action pursuant to the choice of law

provision in Defendant's purchase agreements.

60.     Plaintiff brings this action pursuant to Massachusetts General Law 93A § 11

("G.L. 93A"), on behalf of itself and a class of similarly situated individuals (the "Class")

defined as follows:

> All individuals and entities in the United States who purchased or
> leased a SculpSure Non-Invasive Body Contouring Platform.

61.     Under G.L. 93A, an action may be maintained as a class action if: "the use

or employment of the unfair or deceptive act or practice has caused similar injury to

numerous other persons similarly situated"; the putative class representative "adequately

and fairly represents such other persons"; and the putative class representative brings "the

action on behalf of himself and such other similarly injured and situated persons." [26]

---

[26] Mass. Gen. Laws Ann. ch. 93A, § 11; *Aspinall v. Philip Morris Companies, Inc.*, 442 Mass. 381, 391 (2004).

## A.   Plaintiff Brings Its Claims On Behalf of Numerous Others

62.   The exact number of Class members is unknown and not available to Plaintiff, but on information and belief, since receiving FDA clearance in the third quarter of 2015, Defendant has sold SculpSure nationwide to hundreds of Class members, making joinder of each individual member impracticable. Ultimately, Class members can be identified through Defendant's records.

## B.   Plaintiff and the Class Are Similarly Situated and Have Suffered Similar Injuries

63.   All of the claims asserted by Plaintiff are common to and typical of the Class. Plaintiff and the Class all complain of the same product, SculpSure, and the same wrongful conduct by Cynosure in marketing that product. The misrepresentations that Cynosure made to Plaintiff and the Class have been uniform, namely that: (a) SculpSure could effectively reduce fat with just one 25-minute treatment; (b) the treatment was virtually painless and easily tolerated; (c) the procedure did not require anesthesia; (d) a physician and/or trained staff member did not need to be present during the entire procedure to monitor the patient comfort level and adjust the treatment levels; and (e) no follow-up or additional treatments were necessary.

64.   Likewise, Plaintiff and the Class have suffered similar damages. Plaintiff and the Class did not receive the benefit of the bargain and lost money in the amount spent purchasing or leasing SculpSure and PAC Keys.

## C.   Adequate Representation

65.   Plaintiff will fairly and adequately represent and protect the interests of the Class, and has retained counsel competent and experienced in complex litigation, including class actions. Plaintiff has no interest antagonistic to those of the Class, and Defendant has no defenses unique to the Plaintiff.

## VI.    CLAIMS ALLEGED

### COUNT I
### VIOLATION OF THE MASSACHUSETTS CONSUMER PROTECTION ACT
### (G.L. CHAPTER 93A)

66.    Plaintiff hereby incorporates paragraphs 1 through 65 as if fully set forth herein.

67.    This cause of action is brought by Plaintiff pursuant to the Massachusetts

Consumer Protection Act, G.L. Chapter 93A §§ 2, 11 *et. seq*, on behalf of the Class.  Section 2 of

the Massachusetts Consumer Protection Act provides that "[u]nfair methods of competition and

unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared

unlawful."

68.    Plaintiff, Class Members, and Defendant are "persons" under the Massachusetts

Consumer Protection Act pursuant to G.L. Chapter 93A § 1(a).

69.    The SculpSure device is tangible property involved in "trade" and "commerce"

subject to the Massachusetts Consumer Protection Act pursuant to G.L. Chapter 93A § 1(b).

70.    At all relevant times, Defendant violated and continues to violate the

Massachusetts Consumer Protection Act in its transactions regarding SculpSure.  Specifically,

Defendant deceives buyers by misrepresenting certain qualities and attributes of the SculpSure

procedure.  Defendant uniformly misrepresented to potential buyers that:

(a) SculpSure requires only one 25-minute treatment, when in fact it requires multiple
treatments and still is unlikely to be effective;

(b) the treatment was virtually painless and easily tolerable, when in fact it is very painful
and patients routinely could not tolerate the procedure;

(c) the procedure did not require any anesthesia, when in fact it frequently requires an
anesthetic or analgesic for the patient to be able to proceed with the treatment;

- 19 -

(d) could be performed without a physician or trained staff member present during the entire procedure, when in fact one was required at all times to monitor energy levels; and (e) no follow-up or additional treatments were necessary, which is not true to obtain results.

71.    Defendant's deception has caused substantial injury to Plaintiff and the Class. Plaintiff and the Class cannot recommend a procedure that involves several painful treatments and still does not yield any meaningful result in the patient. Thus, Plaintiff and the Class have spent hundreds of thousands of dollars on a machine that is ultimately inappropriate for their practice and does not work in a commercially viable way. The machine effectively goes unused, not only denying Plaintiff and the Class the ability to make a profit, but also the opportunity to recoup the sizeable costs already incurred. Plaintiff and the Class have lost money and had their businesses placed under considerable financial strain.

72.    Accordingly, as a direct and proximate result of Defendant's deceptive acts and practices, Plaintiff and the Class did not receive the benefit of the bargain, suffered actual damages, and are entitled to trebling, plus attorneys' fees and costs.

## COUNT II
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

73.    Plaintiff hereby incorporates paragraphs 1 through 65 as if fully set forth herein.

74.    Under Massachusetts law, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind."[27] To be merchantable, goods must at least be "fit for the ordinary purposes for which such goods are used."[28]

---

[27] Mass. Gen. Laws Ann. ch. 106, § 2-314(1).

[28] Mass. Gen. Laws Ann. ch. 106, § 2-314(2)(b).

75.     Defendant is a merchant under Massachusetts law who specializes in the marketing and sale of medical devices utilizing laser technology for cosmetic and aesthetic use. Defendant designed, manufactured, and marketed SculpSure, a noninvasive body-countouring device from its offices in Massachusetts.

76.     Beginning in late 2015, Defendant marketed and sold the SculpSure device all over the country. In selling the device, Defendant specifically targeted cosmetic and aesthetic medical practices, including small medical offices and med spas. In selling to those customers, Defendant represented that SculpSure would be appropriate for their practices, namely because it: (a) involves only one, simple 25-minute treatment; (b) is virtually painless and easily tolerated by the patient: (c) would not require any anesthesia; (d) could be performed without a physician and/or trained staff member present during the entire procedure; and (e) would not require follow-up or additional treatments.

77.     At no time, however, has SculpSure actually been suitable for the ordinary purposes for which it is intended. Even when Plaintiff and the Class use the machine as envisioned by its marketing and directed by Defendant, SculpSure cannot successfully be performed as a one-time treatment, frequently causes significant pain in the patient, cannot consistently be performed without anesthesia, and often requires a physician's assistance in administering the treatment. It is thus not fit for use in medical spas, physician offices, and as otherwise marketed by Defendant.

78.     As a consequence, Plaintiff and the Class have spent hundreds of thousands of dollars on a machine that is not suitable for their practices. Plaintiff and the Class have lost money and had their businesses placed under considerable financial strain. Accordingly,

- 21 -

Plaintiff and the Class did not receive the benefit of the bargain, suffered actual damages, and are entitled to trebling, plus attorneys' fees and costs.

## COUNT III
## UNJUST ENRICHMENT

79.　　Plaintiff hereby incorporates paragraphs 1 through 65 as if fully set forth herein.

80.　　From late 2015 to the present, Plaintiff and the Class have purchased hundreds of SculpSure machines from Defendants. In turn, Defendant has received millions of dollars in revenue from Plaintiff and the Class via purchases, lease agreements, and the sale of PAC Keys.

81.　　Defendant has frequently touted the success of its sales of SculpSure, directly attributing the company's record revenues to sales of the machine.[29] Likewise, Hologic, Inc., who acquired Defendant for approximately $1.44 billion in early 2017, consistently singled out SculpSure when discussing reasons for the massive acquisition of the company.[30]

82.　　Defendant's enormous financial gains, however, come at the expense of the financial distress placed upon Plaintiff and the Class. Plaintiff and the Class purchased SculpSure because Defendant marketed the device as not only suitable for their practice, but as premier technology. Specifically, Defendant touted certain attributes, namely that SculpSure (a) involves only one, simple 25-minute treatment; (b) is virtually painless and easily tolerated by the patient; (c) would not require any anesthesia; (d) could be performed without a physician and/or trained staff member present during the entire procedure; and (e) would not require follow-up or additional treatments.

83.　　In practice, however, SculpSure has proved to have none of these characteristics. The procedure cannot successfully be performed as a one-time treatment, frequently causes

---

[29] CYNO – Q2 2016 Cynosure Inc Earnings Call, at 3 (Jul. 26, 2016).

[30] HOLX – Hologic Inc to Acquire Cynosure Inc Conference Call, at 4, 6-7, 9 (2017)

significant pain in the patient, cannot consistently be performed without anesthesia, and often requires a physician's assistance in administering the treatment. Because Plaintiff and the Class cannot recommend a procedure that involves several painful treatments and does not yield any meaningful results, the machine effectively goes unused.

84.     Accordingly, it would be inequitable and unjust for Defendant to retain its ill-gotten fortune. Plaintiff and the Class did not receive the benefit of the bargain, suffered actual damages, and are entitled to trebling, plus attorneys' fees and costs.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff Vita 4 Life, on behalf of itself and the Class, respectfully request that this Court issue an order:

     a) Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiff as class representative, and appointing its counsel as class counsel;

     b) Finding that Cynosure breached the implied warranty of merchantability, violated the Massachusetts Consumer Protection Law, and was unjustly enriched;

     c) Awarding Plaintiff and the Class all appropriate damages, including trebling;

     d) Awarding Plaintiff and the Class restitution in the form of complete disgorgement of all revenue derived from sales or leasing of the SculpSure product;

     e) Awarding Plaintiff and the Class their reasonable litigation expenses and attorneys' fees;

     f) Entering such other injunctive and/or declaratory relief as necessary to protect the interests of Plaintiff and the Class; and

     g) Awarding such other and further relief as equity and justice may require.

## VIII.   JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

Dated:  June 16, 2017

Respectfully Submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By: *Lauren Guth Barnes*

Lauren Guth Barnes (BBO# 663819)
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003
E-mail: lauren@hbsslaw.com

Elizabeth A. Fegan
Mark T. Vazquez
455 Cityfront Plaza Drive, Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4949
Facsimile: (708) 628-4950
E-mail: beth@hbsslaw.com
E-mail: markv@hbsslaw.com

Steve W. Berman
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594
E-mail: steve@hbsslaw.com

David Freydin
Timothy A. Scott
FREYDIN LAW FIRM LLP
8707 Skokie Blvd # 305
Skokie, IL 60077
Telephone: (847) 972-6157

*Attorneys for Plaintiffs, Individually and on Behalf
of All Others Similarly Situated*

2

| CIVIL ACTION COVER SHEET | DOCKET NUMBER<br>17- 1869 F | Trial Court of Massachusetts<br>The Superior Court |
|---|---|---|

| PLAINTIFF(S): | VITA 4 LIFE, INC. | COUNTY |
|---|---|---|
| ADDRESS: | 1300 Busch Pkwy, Buffalo Grove, Illinois | Suffolk |

DEFENDANT(S): CYNOSURE, INC.

| ATTORNEY: | Lauren Guth Barnes |
|---|---|
| ADDRESS: | Hagens Berman Sobol Shapiro |
| | 55 Cambridge Parkway, Suite 301, Cambridge, MA 02142 |

ADDRESS: 5 W. Carlisle Road, Westford, MA 01886

BBO: 663819

### TYPE OF ACTION AND TRACK DESIGNATION (see reverse side)

| CODE NO.<br>B99 | TYPE OF ACTION (specify)<br>Other Tortious Action | TRACK<br>F | HAS A JURY CLAIM BEEN MADE?<br>☒ YES    ☐ NO |
|---|---|---|---|

*If "Other" please describe: Violation of G. L. c. 93A § 11, breach of implied of warranty of merchantability

### STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff counsel relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

### TORT CLAIMS
(attach additional sheets as necessary)

A. Documented medical expenses to date:
   1. Total hospital expenses ..................................................... $
   2. Total doctor expenses ...................................................... $
   3. Total chiropractic expenses ............................................ $
   4. Total physical therapy expenses .................................... $
   5. Total other expenses (describe below) ........................... $
                                                      Subtotal (A): $

B. Documented lost wages and compensation to date ........................................... $
C. Documented property damages to dated ............................................................. $
D. Reasonably anticipated future medical and hospital expenses ....................... $
E. Reasonably anticipated lost wages .................................................................. $
F. Other documented items of damages (describe below) ....................................... $

G. Briefly describe plaintiff's injury, including the nature and extent of injury:

TOTAL (A-F):$

### CONTRACT CLAIMS
(attach additional sheets as necessary)

Provide a detailed description of claims(s):

TOTAL: $

Signature of Attorney/Pro Se Plaintiff: X                           Date:

RELATED ACTIONS: Please provide the case number, case name, and county of any related actions pending in the Superior Court.

### CERTIFICATION PURSUANT TO SJC RULE 1:18

I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

Signature of Attorney of Record: X  *Lauren Guth Barnes*               Date: Jun 16, 2017